# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 05-2940

———————

United States of America,        *
                               *

        Appellee,           *

                               *   Appeal from the United States
    v.                         *   District Court for the
                               *   Eastern District of Missouri.

Harry Meyer Katz,        *

                               *

        Appellant.       *

———————

Submitted: January 13, 2006
Filed: May 9, 2006 (corrected 5/23/06)

———————

Before SMITH and HANSEN, Circuit Judges, and BOGUE,[1] District Judge.

———————

SMITH, Circuit Judge.

Dr. Harry Meyer Katz was charged in a 192-count indictment with attempted or actual distribution of Schedule III and IV controlled substances outside of the scope of medical practice and not for a legitimate medical purpose in violation of 21 U.S.C. §§ 846 and 841(a)(1). Each count of the indictment related to a single prescription written by Dr. Katz for various controlled substances, including Xanax, Darvocet, Alprazolam, Vicodin, and Valium. A jury found Dr. Katz guilty on 176 counts of the

———————

[1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

indictment, and the district court[2] sentenced him to 16 months' imprisonment, a $75,000 fine, and forfeiture of $5,640.[3] Dr. Katz appeals, alleging seven grounds for reversal. For the reasons set forth below, we affirm.

## I. *Facts*

Dr. Katz opened what could be considered an atypical medical practice in Cedar Hill, Missouri, in 1982. Dr. Katz maintained office hours seven days a week and did not accept appointments. Dr. Katz lived in his office and was amenable to opening his doors to a patient in need at any hour. He charged a flat fee, $40 or $45, for all office visits, accepting payment in cash, check or charge; he did not accept medical insurance. Dr. Katz prescribed medications to patients upon request and was suspected of violating federal drug laws. Dr. Katz was eventually indicted based upon prescriptions he wrote for fifteen people,[4] who all testified for the government at trial.

Three of these individuals were undercover law enforcement officers sent into Dr. Katz's office, attempting to obtain a prescription for a controlled substance. Officer Mike Otten visited Dr. Katz four times, acting in an undercover capacity, and each time was equipped with an audio recording device. In each of Otten's visits, he requested a prescription for Xanax, claiming that he wanted the pills to "chill out." Dr. Katz took his blood pressure, measured his height and weight then wrote Otten a prescription for Xanax. Otten paid Dr. Katz $40 in cash. Officer Dawn Molkenbur also visited Dr. Katz, acting in an undercover capacity. She too requested a prescription for Xanax, telling Dr. Katz that she had used it before for personal

---

[2]The Honorable Donald J. Stohr, United States District Judge for the Eastern District of Missouri.

[3]The forfeiture amount represents the amount of fees that Dr. Katz earned for the office visits in connection with the counts of conviction.

[4]Dr. Katz was acquitted of 15 counts relating to patients Carol and Philip Marlowe and one count relating to another patient.

reasons. Dr. Katz wrote her a prescription, and Molkenbur paid Dr. Katz $40 in cash. Lastly, undercover Officer Cynthia Scott visited Dr. Katz, acting in an undercover capacity. Scott asked Dr. Katz for Valium, stating that she liked the way it made her feel. Dr. Katz wrote her a prescription for Diazepam (generic Valium) without conducting a medical examination. Scott paid Dr. Katz $40 in cash.

Daniel Seay first saw Dr. Katz in 1996. Seay testified that he suffered from back and knee pain. He also testified that he had problems with anxiety and panic attacks. Dr. Katz prescribed Seay acetaminophen with codeine for pain, Alprazolam (generic Xanax), and Propoxyphene (generic Darvocet) on his first visit to Dr. Katz's office. Dr. Katz wrote Seay over 82 prescriptions for controlled substances during the course of his treatment.

Charles Beck told Dr. Katz that he wanted medication and specifically asked for Hydrocodone (generic Vicodin), which he was immediately prescribed. Beck continued to visit Dr. Katz between 1999 and 2002, complaining of various injuries and anxiety. During this time, Dr. Katz wrote Beck a total of 117 prescriptions for controlled substances. On one occasion, Dr. Katz wrote Beck a prescription for Vicodin 9 days after he gave Beck a prescription for 30 Vicodin tablets. On another occasion, Dr. Katz wrote Beck a prescription for Vicodin 6 days after he gave Beck a prescription for 30 Vicodin tablets. On a third occasion, Dr. Katz wrote Beck a prescription for Vicodin 7 days after he gave Beck a prescription for 30 Vicodin tablets. Dr. Katz then expressed concern that Beck had a problem with Vicodin abuse, but Dr. Katz continued to prescribe it for him.

Pamela Asher went to see Dr. Katz after a car accident. She told Dr. Katz that she needed medication, and he gave her prescriptions for Darvocet and Diazepam. Pamela Asher pretended to need medication and succeeded in getting Dr. Katz to see her every 2 weeks for 3 years, during which time she received at least 82 prescriptions for Diazepam and Darvocet. Chad Asher, Pamela's husband, first saw Dr. Katz in

1998. Chad claimed that he was having stress and anxiety and a back problem. He specifically asked Dr. Katz for Diazepam and Darvocet. Chad continued to see Dr. Katz every two weeks for the next four years. On occasion, Chad would see Dr. Katz more frequently than every 2 weeks, each time receiving a new 30-day prescription. While seeing Dr. Katz, the Ashers each received the same prescriptions for the same medications.

Dan Bowen, Jr. saw Dr. Katz for several years. Initially, Bowen talked to Dr. Katz about stress and anxiety, resulting from his father's death. Dr. Katz prescribed Xanax. Bowen also told Dr. Katz that he fell on ice and hurt his back and that he suffered from recurrent headaches. Dr. Katz prescribed Hydrocodone for the back pain and Valium for the headaches. Dr. Katz wrote Bowen a total of 51 prescriptions for controlled substances. Peggy Sue Bowen, Dan's wife, saw Dr. Katz for four to five years. She complained of migraine headaches. Dr. Katz initially prescribed Vicodin, but the prescription was later changed to Fioricet and Valium. Over time, Dr. Katz wrote her 49 prescriptions for Valium. Angie Luechtmann, daughter of the Bowens, began receiving Diazepam prescriptions from Dr. Katz in 2001. She told Dr. Katz that she was under stress because she left her husband and her brother was in jail. She also received Fioricet prescriptions from Dr. Katz. Dr. Katz was aware that Luechtmann was a methamphetamine user, but he continued to write at least 25 prescriptions for Diazepam. Dan Bowen III, son of the Bowens, began seeing Dr. Katz in 1999, complaining of stress, and received at least 25 prescriptions for Diazepam.

Danny Turman began seeing Dr. Katz when his surgeon refused to give him any more pain pills after a knee replacement. Turman told Dr. Katz that he had pain in his knee from the knee replacement. Dr. Katz wrote Turman a prescription for Darvocet. Turman saw Dr. Katz every two weeks for a year and a half. During that time, Dr. Katz wrote Turman at least 50 prescriptions for Darvocet and 50 for Lorazepam.

William Bradley, a college student, told Dr. Katz that he had school stress and requested a prescription for Xanax. He actually intended to use the Xanax for personal pleasure. On one occasion, Bradley told Dr. Katz that he injured himself and requested pain medication. Dr. Katz, without conducting an examination of the purported injury, prescribed Darvocet.

Maria Taca gave testimony under Federal Rule of Evidence 404(b) because her prescriptions were not charged in the indictment. At the time of trial, Taca was indicted as a part of a heroin conspiracy and was testifying against Dr. Katz in hopes of receiving a lighter sentence in connection with her own case. She testified that she began seeing Dr. Katz in 1999 to obtain Xanax. Dr. Katz prescribed Xanax and Darvocet. Taca visited Dr. Katz at least every two weeks for about three years. Sometimes, she would use an assumed name and get additional prescriptions. During one visit, Dr. Katz told her that if she combined Soma and Librax together, they would produce the same effect as Xanax. Dr. Katz then gave her Soma and Librax prescriptions.

Each patient/witness testified that Dr. Katz required no paperwork at their initial visit. Further, Dr. Katz never asked for medical or family history. There were usually no physical examinations conducted, and Dr. Katz never referred any of these patients to a specialist or for a second opinion. All of the patient/witnesses paid Dr. Katz in cash and did not receive a receipt.

The government offered the expert testimony of Dr. Ted Parran. Dr. Parran gave the jury an overview of the doctor-patient relationship in general. Dr. Parran then addressed his review of Dr. Katz's patient charts for Charles Beck, Daniel Seay, Chad Asher and Pamela Asher. Dr. Parran testified that the prescriptions written for these four patients were outside of the scope of legitimate medical practice and without a legitimate medical purpose.

## II. *Discussion*

Dr. Katz advances the following arguments on appeal: (1) the district court erred in failing to grant his motion for judgment of acquittal or a new trial based on the sufficiency of the evidence; (2) the district court erred in admitting evidence relating to prescriptions not charged in the indictment; (3) the district court erred in admitting the testimony of Maria Taca pursuant to Rule 404(b); (4) the district court gave erroneous jury instructions; (5) the district court erred in allowing disputed portions of testimony from the government's expert, Dr. Parran, to be submitted to the jury; (6) the government's rebuttal closing argument deprived him of a fair trial; and (7) the district court erred in failing to grant a mistrial following the inappropriate testimony of Chad Asher.

## A. *Sufficiency of the Evidence*

A prosecution under § 841 requires

> proof beyond a reasonable doubt that the doctor was acting outside the bounds of professional medical practice, as his authority to prescribe controlled substances was being used not for treatment of a patient, but for the purpose of assisting another in the maintenance of a drug habit or of dispensing controlled substances for other than a legitimate medical purpose, i.e. the personal profit of the physician.

*United States v. Tran Trong Cuong*, 18 F.3d 1132, 1137 (4th Cir. 1994).

Dr. Katz contends that the record contained no evidence specific to 169 of the counts and insufficient evidence supports the remaining 7 counts of conviction. Dr. Katz maintains that the government relied upon inadmissible evidence calculated to mislead the jury into convicting him based on a medical malpractice standard of negligence. Specifically, Dr. Katz argues he was prejudiced by the government's lumping together all of the prescriptions written for a particular patient, which tended to negate the presumptive legality attached to each prescription. Further, Dr. Katz

-6-

argues that the government must prove the doctor-patient relationship for each alleged illegal prescription. According to Dr. Katz, evidence not connected directly to the writing of a charged prescription should have been considered irrelevant. Lastly, Katz points out that the government's expert opined as to the contents of only four patient records.

"This court reviews the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government, with all reasonable inferences and credibility determinations made in support of the jury's verdict." *United States v. Kelly*, 436 F.3d 992, 996 (8th Cir. 2006). We hold that sufficient evidence supports Dr. Katz's conviction. The 192 prescriptions charged in the indictment represented 192 individual prescriptions written to 15 individuals who visited Dr. Katz. Each of these 15 individual patients testified at trial. The district court admitted all 192 prescriptions into evidence. Each patient testified as to their relationship with Dr. Katz and answered questions regarding their office visits with Dr. Katz. Each patient identified the prescriptions written for them by Dr. Katz and verified that they received the prescriptions from Dr. Katz. Thus, viewing the evidence in a light most favorable to the government, we consider it sufficient to support Dr. Katz's conviction.

Dr. Katz cites *Tran Trong Cuong*, 18 F.3d at 1132, in support of his sufficiency argument. However, *Tran Trong Cuong* is distinguishable, as that court based its holding of evidence insufficiency on the high percentage of counts that lacked patients to testify at trial. 18 F.3d at 1143. No patient testified as to 80 of the 136 counts in the indictment. *Id*. The court held that "[a] defendant is entitled to individual consideration of every count in an indictment by the jury and evidence sufficient to convict on each count beyond a reasonable doubt, if he is to be convicted." *Id*. at 1142. In this case, every patient who received a prescription charged in the indictment testified, enabling the jury to consider each individual count in the indictment. For those reasons, we affirm the district court's denial of Dr. Katz's motion for judgment of acquittal or for a new trial.

B. *Admission of Evidence under Rule 404(b)*

"We review the admissibility of evidence under Rule 404(b) for abuse of discretion. The district court had broad discretion in admitting such evidence and will be reversed only if 'such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.'" *United States v. Voegtlin*, 437 F.3d 741, 745 (8th Cir. 2006) (quoting *United States v. Thomas*, 398 F.3d 1058, 1062 (8th Cir. 2005)) (internal citation omitted). "Rule 404(b) provides that evidence of prior crimes or acts, while inadmissible to prove that a person acted in conformity with the prior act, may be admissible for other purposes, such as 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Id.* (quoting Fed. R. Evid. 404(b)). Evidence is admissible under Rule 404(b) if it is (1) relevant to a material issue, (2) similar in kind and close in time to the crime charged, (3) proven by a preponderance of the evidence, and (4) if the potential prejudice does not substantially outweigh its probative value. *Id.* (quoting *Thomas*, 398 F.3d at 1062).

1. *Admission of Prescriptions Not Charged in the Indictment*

The government introduced evidence of at least 300 prescriptions that were not charged in the indictment but were written for patients who testified at trial. Dr. Katz argues that the mere fact that a prescription was written is not proof of wrongdoing. Dr. Katz asserts that the government introduced the uncharged prescriptions only to impress upon the jury the number of prescriptions that he wrote. The government, in response, contends that the prescriptions were relevant and admissible under Rule 404(b) as proof of knowledge and intent. The district court agreed and stated that the

> [n]on-indicted prescriptions written to individuals named in the indictment appear relevant to the inquiry as to whether defendant had knowledge or intent to prescribe controlled substances to those individuals outside of the normal course of professional practice and without a legitimate medical purpose . . . the issuance of non-indicted

prescriptions to the 'patients in question' does bear on defendant's treatment of those patients and is properly admitted under Rule 404(b).

We find no abuse of discretion in the district court's ruling. First, evidence is admissible under Rule 404(b) to show intent. In this case, a necessary element of the crime charged was whether Dr. Katz wrote the prescriptions for a legitimate medical purpose. Thus, the question of Dr. Katz's intent was central to the case and relevant to a material issue. Second, the prescriptions not charged in the indictment were similar in kind and close in time to the crime charged. Third, the prescriptions not charged in the indictment were proven by a preponderance of the evidence, as the patients to whom they were written testified that they did indeed receive the prescriptions from Dr. Katz. Lastly, the admission of these other prescriptions was not unfairly prejudicial. For those reasons, the district court did not abuse its discretion in admitting the prescriptions not charged in the indictment under Rule 404(b). *See United States v. Green*, 428 F.3d 1131, 1134 (8th Cir. 2005) (holding that the defendant's substantial rights were not affected when the district court allowed nine victims to testify who were not specifically referenced in the indictment).

## 2. *Admission of Testimony from Maria Taca*

Dr. Katz argues that the district court abused its discretion in admitting the testimony of Maria Taca under Rule 404(b). He contends that the admission of Taca's testimony was intended solely to establish criminal propensity and tie him to a "drug smuggler." Dr. Katz submits that the prejudicial impact of Taca's testimony unquestionably outweighed what little probative value that it had. We find no abuse of discretion in the district court's ruling on the admission Taca's testimony under Rule 404(b). Taca's testimony was admitted to show Dr. Katz's knowledge and intent in writing these prescriptions in order to establish that he did not have a legitimate medical purpose in writing them.

Moreover, the testimony satisfies the four-factor test for the admissibility of Rule 404(b) evidence. The testimony was relevant to the material issue—whether Dr. Katz wrote these prescriptions outside the usual course of medical practice and without a legitimate medical purpose. The government established by a preponderance of the evidence that Dr. Katz wrote the prescriptions for Taca. The potential prejudice did not substantially outweigh its probative value, and the other acts were similar in kind and close in time to the crime charged. Therefore, the district court did not abuse its discretion in admitting the testimony of Maria Taca.

## C. *Jury Instructions*

"We review the district court's jury instructions for abuse of discretion, and this court will affirm if the instructions, taken as a whole, fairly and adequately submitted the issues to the jury. A district court has broad discretion in instructing the jury, and jury instructions do not need to be technically perfect or even a model of clarity." *United States v. Garcia-Gonon*, 433 F.3d 587, 591 (8th Cir. 2006) (internal citations and quotations omitted).

## 1. *Rule 404(b) Instruction*

Dr. Katz alleges that the district court gave a highly confusing instruction that did not tell the jurors how to properly consider the evidence admitted under Rule 404(b). The district court gave the following jury instruction for consideration of Rule 404(b) evidence:

> You have heard evidence that the defendant, Harry Meyer Katz, previously committed acts similar to the ones charged in this case. You may not use this evidence to decide whether defendant Katz carried out the acts involved in the crimes charged here. However, if you are convinced beyond a reasonable doubt, based on other evidence introduced, that defendant Katz did carry out the acts involved in the crimes charged here, then you may use this evidence concerning previous acts to decide whether he knowingly and intentionally

-10-

distributed controlled substances without a legitimate medical purpose and outside the scope of professional practice.

Remember, even if you find that defendant Katz may have committed a similar act in the past, this is not evidence that he committed such an act in this case. You may not convict a person simply because you believe he may have committed similar acts in the past. Defendant Katz is on trial only for the crimes charged, and you may consider the evidence of prior acts only on the issue of intent and knowledge.

After review of this jury instruction, we find Dr. Katz's argument without merit. The instruction, as given by the district court, fairly and adequately submitted the issue to the jury and was not confusing.

## 2. *"Willful Blindness" Instruction*

Dr. Katz claims that the district court's willful blindness instruction invited the jury to convict him using negligence principles and that the district court abused its discretion in giving the instruction. Dr. Katz asserts that no evidence was adduced at trial that he intentionally avoided information that would have had a high probability of revealing any improper motives on the part of his patients. In fact, the government's expert testified that a doctor should believe his or her patients unless given a reason not to.

On the other hand, the government argues that a willful blindness instruction was appropriate. The government highlights evidence showing that Dr. Katz ignored many warning signs and red flags and consciously eschewed performing the most rudimentary screening that would have revealed many of his patients' ruses. Dr. Katz sought no patient medical history and never ordered diagnostic or laboratory tests for any of the patients who testified, and he prescribed identical controlled substances to members of the same family. He also provided patients access to controlled substances by routinely refilling 30-day prescriptions when only two weeks had expired.

"A willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge, but the evidence supports an inference of deliberate ignorance. Ignorance is deliberate if the defendant was presented with facts that put her on notice that criminal activity was particularly likely and yet she intentionally failed to investigate those facts." *United States v. Florez*, 368 F.3d 1042, 1044 (8th Cir. 2004) (internal citations and quotations omitted). The evidence is sufficient to support the instruction if a reasonable jury could conclude beyond a reasonable doubt that the defendant either had actual knowledge of the illegal activity or deliberately failed to inquire about it before taking action to support it. *Id.* "If, in light of certain obvious facts, reasonable inferences support a finding that a defendant's failure to investigate is equivalent to 'burying one's head in the sand,' the jury may consider willful blindness as a basis for knowledge." *Id.* In this case, the government adduced ample evidence to support the giving of a "willful blindness" instruction, including testimony from several patient/witnesses that they obtained 30-day prescriptions for controlled substances every two weeks for several years. Accordingly, the district court did not abuse its discretion in instructing the jury on willful blindness.

### D. *Expert Testimony*

Dr. Katz urges that under Federal Rule of Evidence 704(b), Dr. Parran, the government's expert witness, should not have been allowed to testify regarding Dr. Katz's mental state under the subjective prong of the test for criminal liability under § 846. Dr. Parran testified at length regarding his opinions of the standard of care to be followed by physicians in treating persons suffering from pain or anxiety. Dr. Parran also testified, after reviewing the medical records of four of Dr. Katz's patients, that the prescriptions written for these patients "[did] not appear to have been for a legitimate purpose." Dr. Katz further contends that the district court erred in allowing Dr. Parran to testify that a doctor who did not follow the standards of care in diagnosis could not have a legitimate medical purpose to write a prescription. Dr. Katz claims that Dr. Parran's testimony, in effect, lowered the government's burden of proof to a

mere negligence standard, giving the jury license to convict him if it found his prescription methodology differed from Dr. Parran's methodology.

"We review the district court's evidentiary rulings for abuse of discretion." *United States v. Urbina*, 431 F.3d 305, 311 (8th Cir. 2005). Upon review, we find Dr. Katz's argument unpersuasive. First, Rule 704(b) "prohibits experts from stating an opinion as to whether the defendant had the requisite mental state for the crime charged . . . ." *Id*. However, Dr. Parran did not testify regarding the subjective mental state of Dr. Katz upon writing the prescriptions charged in the indictment. In fact, during cross-examination of Dr. Parran, defense counsel asked Dr. Parran on three occasions whether he was purporting to express an opinion as to what Dr. Katz might have had in his mind at the time that he wrote the prescriptions at issue in the indictment. Each time that he was asked, Dr. Parran denied doing so. The district court's admission of this testimony did not run afoul of Rule 704(b).

Second, Dr. Parran's testimony tying standards of care to the existence of a legitimate medical purpose to write a prescription was admissible. "[A] court can allow opinion testimony if the expert's specialized knowledge is helpful to the jury to understand the evidence or determine a fact in issue, even if the opinion embraces an ultimate issue to be decided by the jury." *Id*. (quoting *United States v. Brown*, 110 F.3d 605, 610 (8th Cir. 1997) (internal quotations omitted). Lastly, the government's burden of proof was not lowered to a negligence standard after Dr. Parran's testimony. The district court instructed the jury that they must find beyond a reasonable doubt that Dr. Katz wrote prescriptions outside the scope of medical practice and not for a legitimate medical purpose. Further, the jury was specifically instructed that mere negligence could not support a conviction for criminal conduct. As a result, the district court did not abuse its discretion in admitting Dr. Parran's expert testimony.

## E. *Prosecutorial Misconduct*

Dr. Katz states that it was improper for the Assistant United States Attorney ("AUSA"), in his rebuttal closing argument, to compare him, unfavorably, to "a rogue's gallery of notorious drug criminals while extensively lauding the agents of the Drug Enforcement Administration."[5] According to Dr. Katz, upon his objection, the

---

[5]The AUSA stated the following in his rebuttal closing argument:

There's a war on drugs and the DEA fights it every day. Think about that for a minute with me. It has a history of its own, going all the way back to post World War II, the heroin scourge. And it hit big cities like New York and it rooted in the ghettos, places like Harlem. And think about the history of what heroin did to Harlem in post World War II and then fast forward a decade or so to the 60s and the counterculture movement; sex, drugs, and rock and roll. Tune in, turn on, and drop out. It became the mantra of an entire generation. It was rooted in the Height Ashbury District in San Francisco in the 70s and early 80s in cocaine, powder cocaine. That war was fought in the discotheques and the nightclubs and it reached all the way up to the social elite and the famous and the wealthy. Still, movie actors and rock stars. And then came the 80s and the retardation of cocaine, crack cocaine. And it became a poor man's addiction. And then the 90s with methamphetamine and designer drugs like Ecstacy. There's a crazy logic to it all. They all start out in some exotic locale, the coca fields of Afghanistan for heroin or for cocaine in Brazil—I'm sorry. The poppy fields in Afghanistan for heroin. Mexican superlabs for the methamphetamine that makes it across the border. The tropics of the world for the world's strongest and most potent marijuana. And it all comes to America through some port city. It's Miami, it's New York, it's L.A., it's San Francisco or it sneaks across the border across the Rio Grande and they make it to America. And from there, from those port cities, it hopscotches its way across the United States to the big cities, to the medium cities, to the small towns. And that war is fought on a daily basis by DEA special agents. And it's probably easy to be a

---

-14-

district court merely said "let's get back on track" and let the government resume its "harangue." Dr. Katz suggests that the AUSA improperly attempted to pander to African-American jurors by comparing him to heroin pushers that victimized people in Harlem. In sum, Dr. Katz argues that there was no probative value to these comments; they were intended to prejudice the jury against him. Consequently, Dr.

---

member of that chain somewhere down the line where either the farmer in the poppy field or the cartel leader in Brazil or the smuggler that gets it into the United States or the mule that transports it to the Midwest or the distributor on the street corner who sells it. Because no one along that chain has to see the entire picture in carnage that's left behind. No one has to stand face-to-face with that.

[Dr. Katz objected at this point; the district court overruled the objection, but instructed the government to "get back on track."]

But what do we have here? What do we have here? This man is different than the war on drugs you're familiar with from TV. He is licensed, his is educated, he is trained, and he is experienced. And for all of that he is trusted by all of us who are not those things. He is doctor. But when Mike Otten, Dawn Molkenbur, Cindy Scott, Mr. And Mrs. Marlow, Charles Beck, Dan Seay, the Ashers, Bill Bradley, Danny Turman, and all four of the Bowen family walk into the office and need something from the doctor, they tell him what they want, he does not tell them what they need. When you tell the doctor what you want and he gives it to you without questions asked, that's Doctor Feel Good, that's not Dr. Katz. This doctor is no more than a drug dealer. He has an office instead of a street corner. Do we put a DEA diversion agent in every doctor's office now? We can't. How do we fight convenience doctors, drug dealers? You do. It's not good faith. There is not one scintilla of evidence that this man was acting in good faith. It's more of this. I don't care, here's your prescription . . . .

Katz states the AUSA's comments affected the outcome of the trial. The government contends that during rebuttal closing argument, it discussed the "moral reasonableness" of finding Dr. Katz guilty of his crimes. In doing so, the AUSA contrasted Dr. Katz's crimes with more classic drug offenses with which the jury might be familiar though the mass media. The government asserts that it sought to remind the jury that Dr. Katz was no less guilty simply because he holds a medical degree and operates out of an office rather than on a street corner.

"The trial court has broad discretion in controlling the direction of opening statements and closing arguments, 'and this court will not reverse absent a showing of abuse of discretion.'" *United States v. Conrad*, 320 F.3d 851, 855 (8th Cir. 2003) (quoting *United States v. Johnson*, 968 F.2d 768, 769 (8th Cir. 1992)). "On appeal, we review the facts of each case in order to determine if the prosecutor's remarks unduly prejudiced the defendant's opportunity for a fair trial. We will reverse the conviction if we conclude the jury's verdict could reasonably have been affected by the prosecutor's improper comments." *Id.* (internal citations omitted).

> This court has established a two-part test for reversible prosecutorial misconduct: (1) the prosecutor's remarks or conduct must have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. We employ the following three factors to determine the prejudicial effect of prosecutorial misconduct: (1) the cumulative effect of such misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions taken by the court.

*Id.* (internal quotations and citations omitted).

We agree with Dr. Katz that the comments made by the AUSA during his rebuttal closing argument were improper. The comments "had little or no probative value on any issue at trial;" they "did not relate to an element of the offense nor did the comments aid the fact finder." *Id.* However, we cannot say that the AUSA's remarks prejudicially affected Dr. Katz's substantial rights so as to deprive him of a fair trial. First, examining the cumulative effect of the misconduct, we note that the AUSA's comments were limited to one phase of the trial—closing arguments. *Cf. Conrad*, 320 F.3d at 855–56 (finding that the prosecutor made improper comments throughout the trial, including in his opening statement, during direct examination of witnesses, and during his closing argument). Second, the evidence presented against Dr. Katz was substantial in that it included the testimony of 15 patient/witnesses, regarding more than 400 prescriptions. Lastly, from a review of the record, it appears that Dr. Katz only made one objection during the government's rebuttal closing argument and did not request a curative instruction. The district court overruled Dr. Katz's objection, but warned the AUSA to "get back on track." Thus, in light of the abundant evidence presented supporting the jury's guilty verdict and the fact that the improper comments were limited to the rebuttal closing argument, we find that the government's improper comments made during rebuttal closing argument did not prejudicially affect Dr. Katz's substantial rights so as to deprive him of a fair trial.

### F. *Mistrial*

Finally, Dr. Katz contends that the district court erred in failing to grant a mistrial after a government witness, Chad Asher, twice disclosed to the jury that Dr. Katz had been disciplined by state licensing authorities, which violated the district court's pretrial order. Dr. Katz argues that disclosure of the disciplinary action against him confused the jury and encouraged it to convict him based on this irrelevant and inadmissible fact. Dr. Katz declined a curative instruction, deciding not to call more attention to the impermissible testimony. Dr. Katz argues that the jury would likely

view testimony of his professional discipline as highly probative, confirming in their minds that the state authorities also believed that he behaved improperly. For those reasons, Dr. Katz asks this court to find that the denial of a mistrial was an abuse of discretion.

The government states that the district court characterized Asher's comments as an "isolated incident." The government submits that Asher was one of 17 witnesses who testified over a period of 5 days, and the objectionable testimony came in the form of two brief comments, which were quickly interrupted and not exploited in any way. Thus, the government maintains that it is highly unlikely that these two comments from Chad Asher had any significant impact on the jury.

"The standard of review of a denial of a motion for a mistrial is abuse of discretion. The prejudicial effect of any improper testimony is determined by examining the context of the error and the strength of the evidence of the defendant's guilt." *United States v. Hollins*, 432 F.3d 809, 812 (8th Cir. 2005) (internal citation omitted). "The district court is in a far better position to measure the effect of an improper [answer] on the jury than an appellate court which reviews only the cold record." *Id.* (internal quotations and brackets omitted). The two objectionable portions of Chad Asher's testimony are as follows:

> A. I called him and told him I had an extremely bad tooth ache, and –
> Q. Let me stop you right there. Was that true the first time?
> A. Yeah, it was.
> Q. And what happened?
> A. I recall at that time he was having - - he was in trouble - - his license - -
> Q. I don't want to ask you about any of that, just when you went to the office what happened?
> ***
> Q. Did it ever work?

-18-

A. There were a few instances where I did see him like after 12 days instead of 14. It was supposed to be 14, but then I think he ran into a little trouble with his license - -

Q. Mr. Asher, wait, wait, wait. I just want to talk about the times that you saw him before the 14 days expired. Did you have a conversation with Dr. Katz about that, did he realize you were there early?

Considering the numerous witnesses called to testify in this matter and the amount of evidence presented against Dr. Katz, we conclude these two unsolicited statements in possible violation of the district court's pretrial order were not sufficient to warrant the drastic remedy of mistrial. *United States v. Cole*, 380 F.3d 422, 427 (8th Cir. 2004) ("In the face of the strong evidence and wide array of testimony against Cole, one objectionable statement by a prosecution witness was not sufficient to create prejudicial error."). Therefore, the district court did not abuse its discretion in denying Dr. Katz's motion for a mistrial.

## III. *Conclusion*

For those reasons stated above, Dr. Katz's conviction is affirmed.

_____