**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name:   14a0587n.06

**Case No. 13-5817**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **UNITED STATES of AMERICA,** | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | |
| | ) | **ON APPEAL FROM THE** |
| **v.** | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE EASTERN** |
| **CLARA RODRIGUEZ-IZNAGA, M.D.** | ) | **DISTRICT OF KENTUCKY** |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

**FILED**
Aug 04, 2014
DEBORAH S. HUNT, Clerk

**Before:   BATCHELDER, Chief Judge; KEITH and STRANCH, Circuit Judges.**

**ALICE M. BATCHELDER, Chief Judge.**   Clara Rodriguez-Iznaga appeals the sentence imposed following her conviction for conspiracy to unlawfully dispense Schedule II controlled substances and conspiracy to commit money laundering.   We affirm.

**I.**

At the time of these events, circa 2008-2009, Dr. Clara Rodriguez was 57 years old and facing a possible revocation of her physician's license due to a prior incident unrelated to this case.   In June 2008, she partnered with an Ohio man named Jody Robinson to open a "pain management" clinic in Plantation, Florida, which they named Florida Global Medical ("FGM").   Robinson was not a doctor.

The FGM facility had a waiting area, a reception desk, and three business-style offices, each with a desk, chairs, etc., but no facilities for examining patients.   Later, Rodriguez and Robinson added a "dispensary" to fill the prescriptions written by Dr. Rodriguez.   A third-party company operated the dispensary, which was basically a pharmacy without a pharmacist that

only carried the particular pills that Dr. Rodriguez would order. Upon arriving at FGM (walk-in only, no appointments), the "patient" would pay for an office visit ($200, cash only, no insurance accepted) and wait to see Dr. Rodriguez at her desk in her office to tell her about his or her pain. Dr. Rodriguez required each patient to provide an MRI, and if the patient could not, Dr. Rodriguez would send the patient next door to Plantation MRI to get one. At Plantation MRI, the patient again had to pay cash, but through an agreement (and profit split) between Plantation and FGM, the patient would go straight in to have the MRI taken, without waiting in line.

Dr. Rodriguez would then prescribe for the patient a 30-day supply of pain medication: about 400 pills in some combination of 30-mg oxycodone, 15-mg oxycodone, and 200-mg Xanax. Initially, the patient had to take the prescriptions to a pharmacy to have them filled, but once the on-site dispensary was in place, the patient could fill the prescriptions right there (again paying cash, no insurance, and with a percent of the payment going to Dr. Rodriguez). Dr. Rodriguez and Jody Robinson operated FGM from June 2008 to June 2009 when Dr. Rodriguez quit. During that time they grossed almost $2 million. Dr. Rodriguez netted about $650,000 and Robinson about $600,000, though he apparently gambled it all away as fast as he could make it.

Meanwhile, a joint task-force of police from southern Ohio, eastern Kentucky, and West Virginia, investigating the influx into their areas of pharmaceutical oxycodone pills, found FGM. They found that every 30 days drug traffickers would drive to FGM, get pills, drive home, and sell them. Because that drive is 15 to 18 hours each way, enterprising traffickers would

"sponsor" drug addicts to make the trip as well. The sponsor would drive the addicts to FGM, pay for the office visit and pills, and drive them back to Ohio, Kentucky, or West Virginia. The addict would keep half of the pills and the sponsor would keep the other half to sell.

When police executed a search warrant at FGM, they seized 859 patient files and found that 612 of those patients (71%) were from Ohio, Kentucky, or West Virginia, and had made numerous trips to FGM. The prescriptions filled in the on-site dispensary revealed that 272 Kentucky patients made 966 trips; 255 Ohio patients made 917 trips; and 30 West Virginia patients made 96 trips, for a total of 557 patients making 1,979 trips to FGM and getting about 400 pills each trip.

The police arrested some sponsors and then pursued FGM. Dr. Rodriguez was indicted on one count of conspiracy to distribute Schedule II controlled substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C), and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Robinson agreed to testify against Dr. Rodriguez in exchange for a reduced charge of money laundering, with a four-year prison term. Dr. Rodriguez maintained her innocence and went to trial, insisting that she was ignorant of any wrong-doing, having simply prescribed pain medication to people claiming to be in pain. After six days of trial, the jury convicted her on both counts. And although the evidence of her guilt was overwhelming, even after conviction she continues to insist on her innocence.

During trial, the government had introduced evidence from government records that, during operation of the on-site dispensary, Dr. Rodriguez had ordered some 693,000 oxycodone pills. The Presentence Investigation Report ("PSR") was more specific, reporting that from

August 14, 2008, through September 1, 2009, she had dispensed 16,318.0931 grams of schedule II narcotics, which equaled 109,331 kg of marijuana equivalent. *See* U.S.S.G. § 2D1.1 App. Note 8.(D) (1 gm oxycodone = 6.7 kg marijuana equivalent). The base offense level was 38 for any amount of marijuana equivalent above 30,000 kg. U.S.S.G. § 2D1.1(c)(1).

The question at sentencing was how much of the 109,331 kilograms of marijuana equivalent was relevant criminal conduct for her sentencing in Ohio. Dr. Rodriguez's attorney argued that the court should count only the portion that was sold to Ohio, Kentucky, and West Virginia ("OH-KY-WV") residents for an improper purpose (e.g., trafficking). The sentencing hearing was muddled and somewhat confusing, first because defense counsel was mistaken about the number of patient files from other locales and then, after that had been resolved (and that argument conceded), because counsel continued to insist that Dr. Rodriguez had prescribed pills only for proper pain management purposes; ultimately his theory was that none of the drugs should count towards her sentence. But, as the district court reminded him, the jury had already convicted her of prescribing for improper purposes. Eventually, the district court pointed out:

> There's an inference there, and I'm sure the jury latched on to the inference, that someone with back pain or some other pain is not going to sit in a car for 15 hours and endure more pain to get pills, oxycodone, from a doctor in South Florida when they can go to their local pain clinic in Kentucky to get the pills.

The court then held:

> Th[is] Court does find by a preponderance of the evidence that individuals who would have traveled from Kentucky, West Virginia, [or] Ohio, it strains logic and reason that someone is going to travel 15 hours in a car to go to a pain clinic in Florida to treat their pain when they could go to a pain clinic down the street, across the road[,] or in Ohio, West Virginia[,] or Kentucky. I cannot conclude by a preponderance of the evidence that they would have gone down there for any other reason than to obtain pills to bring back to Kentucky to distribute.

4

At no time did defense counsel offer an alternative explanation or any alternative method for calculating or deciding the relevant drug quantity for sentencing. The government suggested that because 71% of the patients were from OH-KY-WV, the court could use 71% of the total amount that Dr. Rodriguez had prescribed (according to the PSR calculation), and noted that even 50% of that total amount (54,666 kg) was well above the 30,000-kg threshold for setting the base offense level at 38.

The district court – without any real objection from either party – created its own method of calculation (which turned out to be very favorable to Dr. Rodriguez). The court started from the premise that each patient received 240 30-mg oxycodone pills and 90 15-mg oxycodone pills each trip, which the court noted was under-representative because many patients had actually received 120 15-mg oxycodone pills. Next, the court equated that to 48 kg of marijuana equivalent per trip per patient – which is wrong mathematically (it should have been 57 kg each).[1] Then the court referred to the fact that the OH-KY-WV patients made 1,980 trips to FGM (actually 1,979 trips, but also recall that this number counted only the 557 of the 612 total OH-KY-WV patients who filled their prescriptions at the in-house dispensary). The court multiplied those numbers (48 kg marijuana per trip x 1,980 trips) to get 95,040 kg of marijuana equivalent. And even though this number was already based on only those OH-KY-WV patients who filled the prescriptions in-house, the court further reduced that amount by 30%

---

1 (240 pills x 30 mg/pill) + (90 pills x 15 mg/pill) = 8,550 mg, or 8.55 gm oxycodone x 6.7 kg marijuana/gm oxycodone = 57.285 kg marijuana equivalent per trip per patient. In order to arrive at the 48 kg of marijuana equivalent, the district court apparently omitted all of the 15-mg pills (240 pills x 30 mg/pill = 7,200 mg, or 7.2 gm oxycodone x 6.7 kg/gm = 48.24 kg marijuana equivalent). So the court under-counted by about nine kg per patient per trip (in addition to the under-counting that it acknowledged with regard to the 90 versus 120 count of 15-mg oxycodone pills).

because only about 70% (actually 71%: 612 of 859) of the total patients were from OH-KY-WV. This led to a final amount of 66,528 kg marijuana equivalent, which was still well above the 30,000 threshold.

The court set the base offense level at 38 and added two levels for Dr. Rodriguez's abuse of a position of trust for a total offense level of 40. With a criminal history of I, the advisory range was 292 to 365 months in prison. But because the statutory maximum was 240 months, the range was 240. Defense counsel argued for a downward variance to 12 months and one day with time-served and the rest deferred. The district court denied that variance, thoroughly considered the sentencing factors, and sentenced Dr. Rodriguez to 240 months in prison. She appeals.

## II.

Dr. Rodriguez raises two issues on appeal. The first concerns the proper method a court must use to decide the drug quantity as relevant conduct for sentencing. The second issue is a challenge to the substantive reasonableness of her sentence. We find no merit to either.

## A.

The proper interpretation and application of the sentencing guidelines is a question of law that we review de novo. *United States v. Olsen*, 537 F.3d 660, 663 (6th Cir. 2008). We review a district court's drug quantity determination for clear error. *Id.*

In this appeal, Dr. Rodriguez persists in arguing that the prescriptions written to OH-KY-WV residents were for legitimate medical reasons and, therefore, the court should not have considered those drugs as relevant criminal conduct. She claims that the court erred by

"assuming" that all of those prescriptions were for improper purposes. She contends that the government was instead obligated to produce a medical expert to review each of the medical files and provide an opinion as to how much of each prescription was for a legitimate medical purpose; the defense could then cross-examine that expert and provide its own competing expert as to the propriety of each prescription; and then the court could decide how much was illegitimate without assuming, extrapolating, or estimating.

The government points out that the law requires no such approach and, even if such an approach were not needlessly cumbersome, it would be wholly impractical in this case because the medical files on which Dr. Rodriguez would have the expert(s) opine are inherently untrustworthy. Those files contain false entries that Dr. Rodriguez herself fabricated to justify the issuance of the prescriptions. More to the point, the jury already decided that the purpose for the prescriptions was improper.

Dr. Rodriguez relies on two Seventh Circuit opinions to support her argument that the district court was forbidden from estimating or extrapolating, and was instead bound to analyze each patient's prescription individually to determine if it was for a legitimate medical purpose. In *United States v. Chube*, 538 F.3d 693, 694 (7th Cir. 2008), the government had charged two doctors (brothers David and Randy) with 33 counts each of conspiracy to distribute oxycodone, but the jury convicted David of only six counts and Randy of only one. At sentencing, the district court discussed 10 of the 98 patient files and declared all of the prescriptions unlawful. *Id.* at 703-04. On appeal, the Seventh Circuit found no explanation as to "why the prescriptions in the 98 files were not merely unnecessary, but indicative of illegal drug pushing," and

7

concluded that "[t]he court's assumption of a lack of legitimate medical purpose for every prescription in 98 files after discussing only 10 files with any specificity was not enough to support its findings." *Id.* at 704. The Seventh Circuit held that extrapolation was unnecessary:

> When the district court revisits relevant conduct on remand, it must explain its findings with respect to each patient and make a reasoned determination whether or not the Government has carried its burden of establishing that each prescription was dispensed outside the scope of medical practice and without a legitimate medical purpose.

*Id*. at 705-06. Obviously, this approach is more feasible for 98 total patients than for the 612 we have here. But more importantly, here the district court did explain why the prescriptions to the OH-KY-WV residents were not merely unnecessary but instead indicative of drug trafficking, holding that no reasonable person in that much pain would travel 15-plus hours to Florida (every 30 days) when he or she could get the same medication "down the street" or "across the road."

In *United States v. Rosenberg*, 585 F.3d 355, 357 (7th Cir. 2009), the district court considered four (4) patient files and found every prescription written to each patient to be unlawful. The Seventh Circuit reiterated *Chube*:

> *Chube* requires the government to at least address every patient to whom a medical professional defendant has written an allegedly unlawful prescription. It is not necessary, however, for the government to systematically discuss every single prescription that every single patient received. That would be a duplicitous and meaningless procedural requirement. A district court may not, however, as it did in *Chube*, only discuss some of the patient files and extrapolate that, because some of the patients received prescriptions that had no legitimate medical purpose and were outside the usual course of medical practice, all of the prescriptions written to all of the patients had no legitimate medical purpose and were outside the usual course of medical practice.

8

*Id*. at 357-58.   Again, what is reasonable for four patient files is not necessarily so when there are 612.   And, here the district court did not merely extrapolate to the whole from the few – it treated similarly all of the OH-KY-WV residents who would travel 15-plus hours to Florida (every 30 days) when they could get the same medication "down the street" or "across the road."

The government argues that this case is more like *United States v. Huffman*, 529 F. App'x 426, 428-29 (6th Cir. 2013), in which we considered whether 1.5 million oxycodone pills (distributed to numerous patients) was relevant conduct despite Huffman's claim that she had distributed some for legitimate reasons.   In its reasoning, the opinion does not state the number of patients or files; rather we relied on our belief that so many pills in such a short time in a town as tiny as Portsmouth, Ohio, sufficiently proved the illegality of all of the pills.   We held:

> A district court is allowed to estimate the quantity so long as the court can conclude that it is more likely than not that the defendant is actually responsible for an amount greater than or equal to the amount for which she is held legally responsible.

*Id*. at 430 (citing *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008)).   While not completely on point, this is certainly persuasive guidance on the law of this Circuit.

Because our opinion in *Huffman*, albeit unpublished, provides for estimation or approximation; because the Seventh Circuit cases are not compellingly on point; and because the district court here did provide an explanation for its decision (not merely a rote extrapolation from the few to the many or an unsupported estimation), we affirm the calculation of drug quantity made by the district court.

**B.**

The second issue is a challenge to the substantive reasonableness of the sentence, which we review for an abuse of discretion. *United States v. Elmore*, 743 F.3d 1068, 1072 (6th Cir. 2014). Dr. Rodriguez raised this issue in her "statement of issues presented," but did not argue it separately in her brief or elaborate on this contention in any discernable way.

The district court actually sentenced Dr. Rodriguez to a below-guidelines sentence of 240 months in prison, as that was the statutory maximum. When imposing sentence, the court expressly considered the § 3553(a) factors and noted several things in its consideration: Dr. Rodriguez's operation at FGM was clearly a "sham"; she failed to recognize the seriousness of the offense; she continued to blame everyone else and refused to take responsibility; she displayed a callous attitude while testifying; and a sentence any lower would promote disrespect for the law. We find no abuse of discretion here.

**III.**

For the foregoing reasons, we AFFIRM the judgment of the district court.