In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3481

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

NAEEM MAHMOOD KOHLI,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Southern District of Illinois.
No. 14-cr-40038 — **J. Phil Gilbert**, *Judge*.

ARGUED SEPTEMBER 9, 2016 — DECIDED FEBRUARY 1, 2017

Before POSNER, MANION, and WILLIAMS, *Circuit Judges*.

MANION, *Circuit Judge*. Dr. Naeem Kohli, an Illinois physician who specialized in pain management, was convicted on multiple counts of prescribing narcotics without a legitimate medical purpose in violation of § 841(a) of the Controlled Substances Act. On appeal, he argues that the district court should have granted his motion for acquittal based on insufficient evidence. He also challenges the district court's jury instructions and several of its evidentiary rulings at trial.

We conclude that the jury's verdict is supported by sufficient evidence and that the motion for acquittal was properly denied. We further hold that the district court's jury instructions provided a fair and accurate summary of the law, and that its challenged evidentiary rulings were not an abuse of discretion. We therefore affirm Dr. Kohli's conviction.

## I. BACKGROUND

Dr. Naeem Kohli was a board-certified neurologist with extensive training in the treatment of chronic pain. He operated a private medical practice called the Kohli Neurology and Sleep Center located in Effingham, Illinois. Irregularities in the practice eventually caught the attention of federal officials, and in 2014 Dr. Kohli was indicted on three counts of healthcare fraud, two counts of money laundering, and ten counts of illegal dispensation of a controlled substance. During a fifteen-day trial, the jury learned about Dr. Kohli's prescribing practices from a variety of sources, including law enforcement and healthcare professionals, several expert witnesses, and Dr. Kohli's patients and their family members. Dr. Kohli also testified in his own defense.

### A. Expert Testimony of Dr. Parran

Some of the most important testimony came from the government's expert witness Dr. Theodore Parran, an addiction specialist and internal medicine physician who has previously testified for the government in similar prosecutions. See, e.g., *United States v. Chube II*, 538 F.3d 693, 698 (7th Cir. 2008). Before trial, Dr. Parran reviewed Dr. Kohli's patient files for each of the patients who had received the allegedly unlawful prescriptions charged in the indictment. Dr. Parran did not dispute that these patients suffered from legitimate, painful

medical conditions that might ordinarily warrant treatment with narcotics. As Dr. Parran explained to the jury, however, Dr. Kohli's files reflect that he prescribed narcotics to these patients under circumstances that were far from ordinary.

The files showed, for example, that Dr. Kohli routinely prescribed addictive opioids to patients who had a history of drug addiction and who were known to be "multi-sourcing," or simultaneously obtaining various prescriptions for controlled substances from multiple sources or providers. He also prescribed early refills, anywhere from a day to several weeks before the refills were due, to patients who repeatedly claimed that their narcotics medications had run out or were lost or stolen. These same patients often had irregular toxicology screens in which they tested negative for the drugs that Dr. Kohli had prescribed, but positive for other drugs (including illegal drugs and other controlled substances) that he did not prescribe. Dr. Kohli's office also received phone calls from the Veterans Administration and a certain patient's family members reporting that one of his patients was actively abusing drugs. Despite these troubling developments, Dr. Kohli continued to prescribe highly addictive Schedule II opioids, such as oxycodone and hydromorphone, on a regular basis.

According to Dr. Parran, Dr. Kohli's prescriptions under these circumstances offered no medical benefit and were in some cases simply "inconceivable" from a clinical standpoint. Ultimately, based on his review of the relevant patient files, Dr. Parran concluded that the prescriptions identified in the indictment were inconsistent with the usual course of professional practice and had no legitimate medical purpose.

### B. Other Evidence regarding Dr. Kohli's Prescribing Practices

Dr. Kohli's patients testified that he charged $350 per office visit to obtain a prescription for a controlled substance. Patients who did not have insurance, or who had insurance but were visiting early to obtain an early refill, paid the entire fee out of pocket. Dr. Kohli also traveled from his office once a month to see additional patients at Richland Memorial Hospital. The director of physician services at that hospital testified that she noticed Dr. Kohli's prescriptions for controlled substances were already filled out before he saw his patients there. She also observed that Dr. Kohli would see about 30 patients in 90 minutes.

### C. Cross-Examination and Impeachment of Dr. Kohli

For four days, Dr. Kohli testified about his medical practice and insisted that he prescribed narcotics in a good-faith effort to help manage his patients' chronic pain. At one point, on direct examination, he also testified that no patient had ever died under his care: "Have you ever had a patient die under your care? No, sir." He reiterated the point the following day, again on direct examination. Faced with this unexpected claim, the government decided to investigate; it checked with the local coroner's office and found that a patient named Kenneth Kramer had died of an accidental overdose while under Dr. Kohli's care in 2006.

In light of this new information, the government proceeded to impeach Dr. Kohli on cross-examination by questioning his earlier testimony that no patient had ever died under his care. When Dr. Kohli answered as before, the govern-

ment asked him if he remembered his patient Kenneth Kramer. Dr. Kohli replied that he did not. The district court then stopped the government's line of questioning and ordered it to give opposing counsel the materials it had obtained from the coroner's office before the questioning could resume.

After the defense reviewed the materials overnight, the government resumed its impeachment the next day by asking Dr. Kohli (over the defense's objection) if he remembered that a patient named Kenneth Kramer had died of an accidental overdose while under his care. Dr. Kohli responded that he did not know about Kramer's death until he received the materials from the government the day before.[1] The government did not introduce the materials from the coroner's office into evidence, but limited its impeachment to questioning Dr. Kohli on cross-examination and was bound by Dr. Kohli's answers by order of the district court.

### D. Jury Instructions and Verdict

At the close of the evidence, Dr. Kohli moved for acquittal on grounds that the government had failed to present sufficient evidence to sustain a conviction. The district court denied the motion and submitted the case to the jury. The court instructed the jury to render a conviction only if it found, beyond a reasonable doubt, that Dr. Kohli intentionally prescribed controlled substances outside the usual course of professional practice and without a legitimate medical purpose:

> In order for you to find the Defendant guilty of
> a charge of causing the illegal dispensation of a

---

[1] Dr. Kohli also testified, however, that the coroner's office had contacted him after Kramer's death to confirm that Kramer was his patient.

Schedule II controlled substance, the Government must prove the following elements beyond a reasonable doubt as to the charge that you are considering:

1: That the Defendant knowingly caused to be dispensed the controlled substance alleged in the charge you are considering;

2: That the Defendant did so by intentionally prescribing the controlled substance outside the usual course of professional medical practice, and not for legitimate medical purpose; and

3: That the Defendant knew that the substance was some kind of a controlled substance.

The court further instructed the jury to consider the normative standards of professional medical care when evaluating whether Dr. Kohli's conduct deviated from the usual course of professional practice:

In determining whether Defendant's conduct was outside the usual course of professional medical practice, you should consider the testimony you have heard relating to what has been characterized during the trial as the norms of professional practice. You should consider the Defendant's actions as a whole, the circumstances surrounding them, and the extent of severity of any violations of professional norms you find the Defendant may have committed.

Finally, the court cautioned the jury not to convict Dr. Kohli if it found that he acted in good faith:

> [T]he Defendant may not be convicted if he dis-
> penses or causes to be dispensed controlled sub-
> stances in good faith to patients in the usual
> course of professional medical practice. Only
> the lawful acts of a physician, however, are ex-
> empted from prosecution under the law. The
> Defendant may not be convicted if he merely
> made an honest effort to treat his patients in
> compliance with an accepted standard of prac-
> tical practice. . . . Good faith in this context
> means good intentions and the honest exercise
> of good professional judgment as to the pa-
> tient's medical needs.

The jury ultimately convicted Dr. Kohli on seven counts of
illegally dispensing Schedule II controlled substances, in vio-
lation of 21 U.S.C. § 841(a), and acquitted him on the remain-
ing eight counts charged in the indictment. Dr. Kohli was sen-
tenced to 24 months in prison and ordered to pay a fine of
$10,000.

## II. DISCUSSION

Dr. Kohli's primary argument on appeal is that the district
court should have granted his motion for acquittal based on
insufficient evidence. He also argues that the district court
erred by permitting Dr. Parran to testify to legal conclusions
in violation of Federal Rule of Evidence 704, and by permit-
ting the government to impeach him on cross-examination re-
garding the death of his former patient Kenneth Kramer.
Lastly, he contends that the district court's jury instructions
conflated the standards for civil and criminal liability and
thus permitted the jury to convict him based on a finding of
mere civil malpractice. We address each argument in turn.

### A. Motion for Acquittal

Dr. Kohli asserts that he was entitled to acquittal because the evidence did not establish that he intentionally engaged in any unlawful conduct. We review a district court's denial of a motion for acquittal de novo. *United States v. Vallar*, 635 F.3d 271, 286 (7th Cir. 2011).

A motion for acquittal should be granted "only where 'the evidence is insufficient to sustain a conviction.'" *United States v. Jones*, 222 F.3d 349, 351–52 (7th Cir. 2000) (quoting Fed. R. Crim. P. 29(a)). When considering the sufficiency of the evidence, "[w]e view the evidence in the light most favorable to the government and will overturn a conviction only if the record contains no evidence from which a reasonable juror could have found the defendant guilty." *United States v. Longstreet*, 567 F.3d 911, 918 (7th Cir. 2009); see also *Jones*, 222 F.3d at 352 ("[A]s long as *any* rational jury could have returned a guilty verdict, the verdict must stand."). When challenging a conviction based on sufficiency of the evidence, a defendant bears a "heavy" burden that is "'nearly insurmountable.'" *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008).

To convict a prescribing physician under § 841(a) of the Controlled Substances Act, the government must prove that the physician knowingly prescribed a controlled substance outside the usual course of professional medical practice and without a legitimate medical purpose. *United States v. Pellmann*, 668 F.3d 918, 923 (7th Cir. 2012); *Chube II*, 538 F.3d at 698; 21 C.F.R. § 1306.04(a). In other words, the evidence must show that the physician not only intentionally distributed drugs, but that he intentionally "act[ed] as a pusher rather than a medical professional." See *Chube II*, 538 F.3d at 698; see also *United States v. Moore*, 423 U.S. 122, 138–43 (1975).

In this case, the government presented ample evidence establishing that Dr. Kohli intentionally abandoned his role as a medical professional and unlawfully dispensed controlled substances with no legitimate medical purpose. Indeed, Dr. Kohli's own patient files (introduced through the testimony of Dr. Parran) showed that he regularly prescribed highly addictive and potentially dangerous Schedule II opioids to patients who (1) had a known history of drug abuse; (2) repeatedly sought early refills based on dubious claims that their medications had disappeared; (3) frequently "multi-sourced" their prescriptions by simultaneously obtaining additional quantities of controlled substances from other providers; and (4) displayed alarmingly irregular toxicology results suggesting both obvious drug abuse and possible secondary dealing. Based on this evidence, a reasonable jury could infer that Dr. Kohli knowingly prescribed controlled substances to patients who were misusing the prescriptions, and thus that he deliberately made the prescriptions outside the ordinary scope of professional practice and with no acceptable medical justification.

To be sure, Dr. Kohli presented conflicting evidence, including his own testimony, indicating that he made the challenged prescriptions in a good-faith medically appropriate effort to manage his patients' chronic pain. But the jury was not required to believe that evidence, and we will not supplant the jury's credibility findings on appeal. See *United States v. Griffin*, 84 F.3d 912, 927 (7th Cir. 1996); *United States v. Curry*, 79 F.3d 1489, 1497 (7th Cir. 1996) ("[Q]uestions of credibility are solely for the trier of fact."); *United States v. Nururdin*, 8 F.3d 1187, 1194 (7th Cir. 1993) ("As an appellate court, we 'will not reweigh the evidence or judge the credibility of witnesses when reviewing the sufficiency of the evidence.'").

Dr. Kohli also argues that his case should not have gone to a jury because, unlike in the typical "pill-mill" prosecution, the evidence here convincingly established that the relevant prescriptions were given exclusively to patients who suffered from documented medical conditions associated with chronic pain. Since the evidence also showed that these same patients exhibited addictive behaviors, Dr. Kohli contends that the jury must have convicted him based on an erroneous belief that the Controlled Substances Act categorically criminalizes prescribing narcotics to patients who happen to suffer from addiction disorder in addition to chronic pain.

This argument misses the mark. The issue before the jury was not simply whether Dr. Kohli prescribed narcotics to drug addicts. That, in itself, is certainly not a violation of the Controlled Substances Act.[2] Rather, the issue was whether he deliberately prescribed outside the bounds of medicine and without a genuine medical basis. As discussed above, the government presented substantial evidence that Dr. Kohli intentionally prescribed narcotics to patients that he knew were misusing the prescriptions rather than legitimately using them to treat pain. A rational jury could thus conclude that those prescriptions were essentially non-medical in nature and served no legitimate medical purpose—regardless of

---

[2] Indeed, certain controlled narcotics are commonly used to *treat* narcotic addiction. See Drugs.com https://www.drugs.com/suboxone.html; https://www.drugs.com/methadone.html (last visited Feb. 1 2017). Nor are physicians prohibited from prescribing narcotics to drug-addicted patients for the purpose of pain management, so long as the prescription is made within the usual course of professional practice and is intended to confer a medical benefit.

whether the patients were addicted to the drugs (non-addicted patients can misuse drugs too), and regardless of whether they suffered from medical conditions that might otherwise warrant treatment with those same drugs under different circumstances.

To be clear, we agree with Dr. Kohli that physicians are not automatically liable under § 841(a) whenever they prescribe narcotics to a patient who happens to be addicted; but we add that neither are they automatically immune from liability whenever a patient who is obviously misusing their prescription happens to suffer from chronic pain. The Controlled Substances Act does not give physicians carte blanche to prescribe controlled drugs for a non-medical purpose simply because the immediate recipient of the prescription has an illness that the drugs could in theory alleviate if used properly. In every case, the critical inquiry is whether the relevant prescriptions were made for a valid medical purpose and within the usual course of professional practice. Here, a jury could reasonably conclude that they were not.

In sum, viewed in the light most favorable to the prosecution, the evidence was sufficient to enable a rational jury to conclude beyond a reasonable doubt that Dr. Kohli intentionally and knowingly prescribed controlled substances outside the usual course of professional medical practice and without a legitimate medical purpose. The conviction is supported by sufficient evidence, and the motion for acquittal was properly denied.

### B. Expert Testimony of Dr. Parran

Dr. Kohli next argues that the district court erred by allowing Dr. Parran to testify about applicable legal standards and

legally dispositive issues in violation of Federal Rule of Evidence 704. We review the district court's decision to admit expert testimony for an abuse of discretion. *United States v. Goodwin*, 496 F.3d 636, 641 (7th Cir. 2007). Rule 704 permits experts to testify about an "ultimate issue" in a case, Fed. R. Evid. 704(a), but prohibits them from stating an "opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense," Fed. R. Evid. 704(b).

Dr. Parran's expert testimony in this case falls squarely within the parameters of Rule 704. As noted earlier, Dr. Parran testified that he believed certain of Dr. Kohli's prescriptions were inconsistent with the usual course of professional practice and lacked a legitimate medical purpose. That testimony tracks the elements necessary to sustain a conviction for illegal dispensation, see 21 C.F.R. § 1306.04(a), and it therefore embodies an opinion about ultimate or dispositive issues in the case. Such opinions are expressly allowed, however, under Rule 704(a). Likewise, consistent with Rule 704(b), Dr. Parran offered no opinion about Dr. Kohli's subjective mental state when he wrote the prescriptions at issue, or about whether Dr. Kohli had the requisite intent to be convicted of the crimes charged. Dr. Parran did not rely on "'some special knowledge of [Dr. Kohli's] mental processes," but clearly and properly based his expert opinion on a review of Dr. Kohli's office records in light of his own experience and training. See *United States v. Winbush*, 580 F.3d 503, 512 (7th Cir. 2009).

We also reject Dr. Kohli's argument that Dr. Parran exceeded his role as a medical expert witness by instructing the jury on the applicable legal standard. It is true that Dr. Parran's testimony touched on the applicable standard of care

among medical professionals—a standard that is no doubt closely linked to § 841(a)'s prohibition on prescribing outside the "usual course of professional medical practice." But testimony on the standard of care is not converted into an impermissible jury instruction on the governing legal standard just because the two standards overlap. If that were the case, physicians could virtually never offer meaningful expert opinions in prosecutions under § 841(a). See *Chube II*, 538 F.3d at 698 (recognizing that "it is impossible sensibly to discuss the question whether a physician was acting outside the usual course of professional practice and without a legitimate medical purpose without mentioning the usual standard of care").[3] Dr. Parran did not lecture the jury about the legal meaning or application of § 841(a), but simply opined that certain of Dr. Kohli's actions were medically unjustified and contrary to standard professional medical practice. That opinion was within Dr. Parran's area of expertise and was not inappropriate under Rule 704 or otherwise.

Accordingly, the district court did not abuse its discretion in admitting Dr. Parran's expert testimony.

### C. Impeachment on Cross-Examination

Dr. Kohli also maintains that the district court erred by allowing the government to impeach him about the death of his former patient Kenneth Kramer. We review the district court's ruling for an abuse of discretion. See *United States v. Boswell*,

---

[3] See also *United States v. Feingold*, 454 F.3d 1001, 1007 (9th Cir. 2006) ("[O]nly after assessing the standards to which medical professionals generally hold themselves is it possible to evaluate whether a practitioner's conduct has deviated so far from the 'usual course of professional practice' that his actions become criminal.").

772 F.3d 469, 476 (7th Cir. 2014); *United States v. Owens*, 145 F.3d 923, 927 (7th Cir. 1998).

It is well-settled that "when a criminal defendant elects to testify in his own defense, he puts his credibility in issue and exposes himself to cross-examination, including the possibility that his testimony will be impeached." *Boswell*, 772 F.3d at 475; see also *United States v. Taylor*, 728 F.2d 864, 874 (7th Cir. 1984). As mentioned earlier, Dr. Kohli unequivocally testified—not once but twice—that no patient had ever died under his care: "Have you ever had a patient die under your care? No, sir. . . . I never had a problem, a patient died on me." By making these affirmative statements on direct examination, Dr. Kohli put his credibility in issue and thus opened the door for the government to impeach him on cross-examination. We agree with the district court that the government had every right to question the truthfulness of what Dr. Kohli himself chose to say in his own defense in open court.

### 1. *Collateral Evidence Rule*

Dr. Kohli tries to evade this conclusion by invoking the familiar rule against impeachment by contradiction on collateral matters (commonly known as the collateral evidence rule). But that rule does not apply here for several reasons. To begin, the collateral matter at issue—whether any patients had ever died under Dr. Kohli's care—was elicited by Dr. Kohli's counsel on *direct* examination, not by the government on cross-examination. See *Taylor*, 728 F.2d at 873–74 (emphasizing that the collateral evidence rule applies only when a witness is "impeached by contradictions as to collateral or irrelevant matters *elicited on cross-examination*"). Furthermore, the rule is implicated only when a party presents "extrinsic evidence" that a witness's testimony is incorrect. *United States*

*v. Senn*, 129 F.3d 886, 893–94 (7th Cir. 1997).[4] As previously stated, however, the government offered no extrinsic evidence (e.g., documents from the coroner's office or testimony from the coroner) to impeach Dr. Kohli, but limited its impeachment to questioning him on cross-examination and accepted his answers without contradiction.[5] See *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 605 (7th Cir. 1985), abrogated on other grounds as recognized by *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 425 n.12 (7th Cir. 2015) (specifying that "the collateral evidence rule does not . . . limit the scope of all types of impeachment *by cross-examination*," but "merely precludes *extrinsic evidence* of certain facts that would impeach by contradiction").

### 2. *Rule 16*

Dr. Kohli also contends that the government failed to timely disclose its impeachment materials in violation of Rule 16 of the Federal Rules of Criminal Procedure, which requires the government to promptly disclose any documents that are within its possession, custody, or control, and that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i), (c); see also Fed. R. Crim. P. 16(a)(1)(B), (F). According to Dr.

---

[4] See also *Taylor v. Nat'l R.R. Passenger Corp.*, 920 F.2d 1372, 1375 (7th Cir. 1990) ("[T]he collateral evidence rule limits the extent to which the witness' testimony about non-essential matters may be contradicted by extrinsic proof.").

[5] Although the government referenced the exhibit number of the coroner's report during cross-examination, the exhibit was not admitted into evidence.

Kohli, Rule 16 required the government to turn over the information from the coroner's office before using that information to initiate its impeachment on cross-examination.[6]

We see no reversible error. As a preliminary matter, we're doubtful that Rule 16 applies here because the information from the coroner's office bears no relation to the charges in this case (Kramer died years before the earliest events giving rise to the indictment) and so doesn't appear "material to preparing the defense." Rather, the information became material—for the limited purpose of impeaching Dr. Kohli—only after Dr. Kohli voluntarily testified at trial that no patient had ever died under his care. It is difficult to see how an admittedly "collateral matter" that is otherwise irrelevant to the pending charges could suddenly become "material" to the defense simply because the defendant chooses to testify about it on direct examination. See *United States v. Caro*, 597 F.3d 608, 621 & n.15 (4th Cir. 2010) (collecting cases) (holding that information is "material to the defense" under Rule 16(a)(1)(E)(i) only if there is "some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor").

In any event, even if the government violated Rule 16 by failing to disclose the coroner's report sooner than it did, any error was harmless. The materials were not introduced into

---

[6] Recall that the government had not yet disclosed the coroner's report when it initially asked Dr. Kohli if he remembered a patient named Kenneth Kramer. (Of course, after Dr. Kohli answered that initial question, the government promptly disclosed the report and did not resume its inquiry until the defense had time to review it.)

evidence, and the district court granted a continuance by allowing the defense to review the materials overnight before the government could continue its cross-examination the following day. Under Rule 16, these remedial measures were clearly within the trial court's discretion and effectively cured any harm that might otherwise have resulted from the supposed violation. See Fed. R. Crim. P. 16(d)(2) (stating that a district court may remedy a Rule 16 violation by, among other things, granting a continuance, ordering the government to permit the inspection of the materials in its possession, or prohibiting the introduction of the materials into evidence).

On the whole, the district court's balanced approach to Dr. Kohli's impeachment was reasonable and not an abuse of discretion. Reversal is not warranted.

### D. Jury Instructions

Dr. Kohli's final argument is that the district court erroneously instructed the jury that a finding of civil malpractice was sufficient to support a conviction. A district court has substantial discretion in formulating the precise wording of jury instructions "'so long as the final result, read as a whole, completely and correctly states the law.'" *United States v. Gibson*, 530 F.3d 606, 609 (7th Cir. 2008). Dr. Kohli's counsel did not object to the jury instructions he now challenges on appeal, so we review the instructions for plain error.[7] *United*

---

[7] The government alternatively argues that Dr. Kohli has waived the right to appellate review by affirmatively approving the challenged instructions at trial. See *United States v. Anifowoshe*, 307 F.3d 643, 650 (7th Cir. 2002) ("Waiver of a right at the trial level precludes a party from seeking review on appeal."). Because we conclude that the instructions were not plainly erroneous, we need not reach this alternative argument.

*States v. Javell*, 695 F.3d 707, 713 (7th Cir. 2012). Plain-error review "is 'particularly light-handed in the context of jury instructions,' since it is unusual that any error in an instruction to which no party objected would be so great as to affect substantial rights." *United States v. DiSantis*, 565 F.3d 354, 361 (7th Cir. 2009).

The district court's jury instructions in this case were not plainly erroneous. The court instructed the jury to convict Dr. Kohli of illegally dispensing controlled substances under § 841(a) only if the jury found, beyond a reasonable doubt, that Dr. Kohli (1) knowingly and intentionally prescribed controlled substances (2) outside the usual course of professional medical practice, and (3) for no legitimate medical purpose. That is exactly what the statute requires to support a conviction. See 21 U.S.C. § 841(a); 21 C.F.R. § 1306.04(a). The district court thus correctly spelled out each of the elements of the offense, and clearly articulated the appropriate burden of proof governing criminal liability. The court further instructed the jury that it should *not* convict Dr. Kohli if it found that he made the relevant prescriptions in good faith.

We see no support for Dr. Kohli's argument that the district court somehow conflated the standards for civil and criminal liability, or that it otherwise misled the jury into believing that it could find Dr. Kohli criminally liable for engaging in mere civil malpractice. The district court's jury instructions fairly and accurately stated the law and do not warrant reversal.

### III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.